178036, and I have parenthesis 178042, so these may be consolidated numbers, I'm not quite sure. Perhaps the counsel will explain. Ms. Betzel, are you representing the appellant? I am representing the appellant. Cross appellant. All right. Good enough. Thank you very much. We are ready to proceed whenever counsel is ready. If you'll enter your appearance, please. Your Honor, Marcy Branworth for the appellant. Thank you. Thank you. Yes, as you are. As you are. That's fine. Thank you. Thank you, Your Honor. May it please the Court and counsel, Marcy Bramlett, on behalf of Petitioners, I'd like to reserve three minutes for rebuttal. And it's Bramlett. Bramlett, yes. Thank you. This case and this record that come to the Court today illustrate a compelling course of events and an even troubling offense to the First Amendment of the Constitution by a city and its representative. And while the legal nuances of this multi-issue appeal are numerous and complex, I'm going to ask the Court to never lose sight of what this case is really about. One citizen who voiced what would later be shown to be substantiated complaints about a city and its employees. This is a case about state-sponsored retaliation for criticism of city government, its inefficiencies, its waste of taxpayer money, and its incompetence. This case is confusing even to those of us who have been litigating it for several years, so I'll do my best to lay out the landscape of the players before the Court in a clear way in the short time that I have. On one side, you have the city of Casper. You have its city manager, John Patterson, its city engineer, Andrew Beamer. Also involved for the city are the city attorney, multiple private lawyers hired by the city during these events, and the city council. And on the other side, you have Craig Hedquist, a local contractor who owns a company called HCI. HCI has a decades-long history of public works projects for YDOT, the city of Casper, and other cities, towns, counties across Wyoming. I'd like to talk first, though, about Hedquist's First Amendment retaliation claim against the city. The district court ruled that no reasonable jury could find that Hedquist's protected speech was a motivating factor in the retaliation against him. It did this through a Garcetti-Pickering analysis, and what I'd like to point out first, and I think I may have even missed this in the briefing, is that it's not, I'm not sure this is the correct test. Hedquist was a citizen at the time of his first speech. He was then a candidate, and ultimately a public official. Do you accept we apply Worrell in this case? I think you certainly could, and the cases might even suggest that public officials are something kind of different, a hybrid of sorts. But in a way, I don't think it matters, because ultimately the court would be asked to consider under either test whether protected activity was a motivating factor in retaliation, and that's the question that the district court ruled on in this case. So you're not choosing between the two here? I'm telling the court that I don't think either I or the court necessarily has to. I think the question is the same in either case as to Mr. Hedquist. The district court got to its holding in two ways. It restricted the form and the instances of retaliation and contravention of the record, and it ignored clear evidence of direct retaliation for speech also in the record. I want to place a very bright point in the minds of the court today, and that's August 28th of 2013. This was the date of an interaction between the city engineer and Hedquist on an HCI job site, where Hedquist called the city manager a bitch. This would spawn a workplace violence investigation, a conflict of interest investigation, and removal proceedings for Hedquist from the city council. But again, August 28th of 2013. And the largest problem for the district court, I want to be very clear about the timeline, is that the retaliation in the speech happened long before this instance on a job site. In 2012, as Hedquist announces presidency, the city manager starts to ask the chief of police for information on Hedquist, to use city police resources to search for information. Beamer, the city engineer, starts recording Craig Hedquist on HCI job sites during meetings. The city would never provide information that Craig Hedquist sought regarding job costing information. The city would withhold $750,000 of payment owed to HCI over the summer leading up to August of 2013. Let me be clear about one thing, though. Isn't the First Amendment retaliation claim against the city HCI's claim? HCI has a claim against the city, but Craig Hedquist also stated a claim against the city. The city and its city manager, John Patterson. Okay. Now, let me follow your argument up to this point. This August 13th, 2013 event, Hedquist uses derogatory word towards where? Towards Beamer. Towards Beamer on the job site. Is Beamer a woman? No, Andrew Beamer is the city engineer. And what does bitch come in? He said, are you going to step up and pay me? Are you going to pay me, bitch? Paraphrase. Referring to the $750,000 owed to HCI at that time. And, but I think perhaps the most troubling thing, the retaliation that's really alarming that occurs a month before this happened is that the city manager, after being told a year before that using police resources to search for information on Craig Hedquist was illegal, goes back to that same chief of police and they decide to pull what that chief of police would call a whole mountain of information on Craig Hedquist, including land purchases, associations, associates, people, etc. And there's a recorded phone call that Patterson does not know that was recorded, again, occurring before the August incident where he says, boy, Craig Hedquist has been raising hell and I'd like a more final solution to this problem, so what do you got? And the chief of police says, well, I've got a whole mountain of stuff for you, I'll put it together and then we'll talk and I have some ideas that might help you out. So this idea that the retaliation is limited in scope to these kind of administrative procedures is incorrect. But also the idea that that's the only retaliation and the timing directly contradicts it. There's also direct evidence of the retaliation after that date for certain, including the conflict of interest investigation which is anchored by the city's allegations that Hedquist requesting this job costing information would somehow lead to an advantage for his company. When the city had done that approximately six months before and pulled that information, the head of public works had written a letter to Patterson that said any citizen or council member should be able to request this information and we should have it. That letter was never provided to Craig and the copy of that letter that was given to the investigator had that paragraph removed, which is interesting. There was also a 2013 request to install surveillance directly related to Hedquist in city council chambers and coat rooms and perhaps one of the most troubling aspects of the record is the city manager's inquiring of chief of police applicants later on how they would deal with what he called the Hedquist problem. The applicants who were some long-time members of Wyoming law enforcement found this odd and unprofessional and quite concerning. The city would withdraw an award of substantial completion given to HCI, that's an unprecedented thing in the annals of city contracts, and it triggered retroactive liquidated damages and forced HCI into a long, drawn-out mediation. Well, it depends on what the Hedquist problem is. I mean, this is about whether they're trying to chill his speech and calling somebody a bitch in many contexts is fighting words and so that isn't protected by the First Amendment. The fact that the city may have viewed your client as disruptive and wanted to deal with the Hedquist problem would not give you a First Amendment claim, would it? I don't, I think you're absolutely right, and I think the fighting words question is probably a rabbit hole, but the point... Calling somebody a bitch is not fighting words? No, I mean that it's, we haven't alleged that it's protected speech in our appeal because I don't believe... Well, but it's a First Amendment retaliation, right? But the point being that what continues to happen after that incident is a part of the bitch incident is part of this picture and it's certainly not good behavior by my client, but the allegation that everything that they're doing after this and all the retaliation is for that incident, because of that incident, is disingenuous when you look at the record, which the district court failed to do. What is the date of the meeting at which they talked about the general use of taxpayer money? That's December of 2012. So Craig Hedquist was elected in November of 2012. He kind of brings together a group of local contractors, including his competitors, to meet with Patterson and other city officials so that they can talk to them about how the city bids work and what's efficient use of taxpayer dollars, and that's memorialized in emails by Patterson and the city, where Patterson even thanks Craig for taking this step. Right, so that, so let's say we agree with you that that's protected speech. How do we segregate that incident from all the remainder of the accusations? Well, okay, and so I think what you're asking me kind of relates to the holding regarding HCI not having speech of a public concern, because that 2012 meeting was really HCI. I think the important point there is that any attempt to distinguish between the speech of Craig Hedquist and the speech of HCI is artificial, and it's not supported in the case law. It's what we've tried to do to simplify this case for both the district court and now, and it's what's... Well, wait a minute. Why is it that important as it relates to what is the retaliation that has taken place? I mean, it seems to me the retaliation that would go to HCI is not going to be the same as the retaliation that would go to Mr. Hedquist, example being their delisting of HCI. That's not an act directed at Mr. Hedquist. That's an act directed at HCI. The retaliation is absolutely separate and distinct, but the speech, and I think if you look at the line of cases including Mimics out of the Tenth Circuit, Umber and O'Hare, these were all actions and speech by a principal or owner of a company that was retaliated against essentially for third-party protected speech. Okay, so as a principal of HCI, we're concerned with the speech of Mr. Hedquist. Yes. That's fine. All I'm saying is that you need to draw a line for retaliation purposes from aspects of his speech to HCI when the claim is to HCI. Yes. So the retaliation against HCI is really more of the tangible retaliation, right? It's the delisting that ends up costing Hedquist over a million dollars in profits and costing the city of Casper nearly a million dollars by going with low bidders. And so it's a very real, tangible thing. The retaliation against Mr. Hedquist is a lot more of these efforts to remove him from the city council. And when efforts against him personally don't work, the conflict of interest investigation, a vote to try to remove him and to discredit him in the community, when that doesn't work, then the pressure dials up against HCI. We start with the financial coercion after this public, reputational, political coercion doesn't do the trick. One of the words you used was public. Public. Well, some of the allegations of retaliation that you alluded to, they weren't public. I mean, making calls to people saying, or the interview, what are you going to do about the Hedquist problem? I mean, where is there evidence he even knew about that? That Craig knew about it? Correct. Well, I don't know that retaliation necessarily has to be known about by a client. It has to be able to chill speech, right? And it can't chill speech if I don't know about it. Well, under the Worrell test, which is for citizen and HCI, if we're talking about the HCI retaliation, I think Garcetti would absolutely apply because of the contractor that's pursuant to the Umber line of cases. But as to Craig, once he's a – I think the cases would say that Garcetti – Wait a minute. You're saying – I thought you were ambivalent about what test applies. You're now saying Garcetti applies to this situation? Okay. So, if Craig is his capacity as a citizen, Worrell would apply. Craig in his capacity as a public employee or a public official, it seems like the cases say Garcetti would apply. Okay. And what you're saying is to me, if under the Worrell test, we're talking about chilling, not only would these actions of declaring HCI nonresponsible better chill a person of ordinary firmness, they absolutely did. I'm not talking about that concrete act as you did to use your word. I'm talking about all these other acts that he conceivably was not aware of. How would they chill him? You know, how do you deal with the Hedquist problem, the call about can you get any information on Mr. Hedquist? Those things were things that he was not necessarily aware of, right? Well, yes. But I think what the cases would say is the more abstract question of whether using police resources to search for information on someone, hiding information, trying to get someone removed from their elected official position, those would all absolutely meet the test of chilling a person of ordinary firmness. If they knew about them? If he doesn't know about them, how does he have an actual claim? How Mr. Hedquist has an actual claim? If you don't know about it, if I'm out there plotting against you and you don't know about it, how does that chill your First Amendment, how does your First Amendment speech even get implicated? Well, Mr. Hedquist knew as early as August of 2013 that they were trying to remove him. You mentioned specific acts of conduct. Those acts, what I'm trying to posit, would need to have some connection with Mr. Hedquist's knowledge in order for it to have a chilling effect. Do you disagree with that? I'm telling you that Hedquist knew. He knew. That's not good enough. It's got to be in the record. He can have, he can know about the ether in the air, but that's not, that's not. Well, he absolutely knew that the statements by Mr. Patterson were made to the press. Those are in the record. The investigations were served on Mr. Patterson, or on Mr. Hedquist and his counsel. Go ahead, please. Okay. I think you ought to reserve the rest of your time. I will. Thank you. Thank you. May it please the Court and Your Honor, good afternoon. My name is John Masterson, along with my partner, Elena Stedelli, who's in the gallery. We represent the city of Casper and its former city manager, John Patterson, in his official capacity. At counsel table is Bruce Salzberg, who represents Mr. Patterson in his individual capacity, and Ms. Kaylynn Bestel on behalf of Andrew Beamer, another defendant who was the city engineer. We're going to try to do the impossible and split our 15 minutes so we can each have a short opportunity to address you and talk about the issues raised here. And the official capacity claims, are they brought against you by both HCI and Mr. Hedquist? No. Only Hedquist, only Mr. Hedquist sued Mr. Patterson in his official capacity. Okay. HCI sued the city of Casper and Mr. Beamer, and Mr. Hedquist sued the city of Casper and Mr. Patterson in both capacities. Okay. Now, at this 2012 meeting, when they had the general discussion on the use of taxpayer money, who was present? Your Honor, that's a great question because the only evidence of what took place at that meeting is an email, an internal email from city staff to the city manager at the time summarizing what that city staff member perceived took place at that meeting. My understanding- We'll find that in the record. Yes, sir. All right. You will. And I'm sorry, I was just looking for the site, but it is included in the record, sir. I believe there was a group of local contractors in the city of Casper who wanted to meet- Including a representative for HCI, correct? Yes. Yes, Your Honor. Mr. Hedquist was present. All right. Again, it's an internal email summarizing the meeting. There is one reference to HCI in that email to a comment that HCI made. And that comment related to a prior project that HCI did for the city of Casper where there was a problem. It was called the Fairgrounds Road Project. And there was a problem and a dispute between the city of Casper and Mr. Hedquist. And I believe in that email, as we interpret it, the only thing that came up was a mention of the problems that Mr. Hedquist had with this one contract. There was no mention of city funds and taxpayer money in that. In my view, what that email reflects is a discussion among contractors and city management about how to make the performance of those city contracts better, more efficient. They are accusations and a back and forth about how are we going to deal with various situations. Now, there's no question, but that that's a discussion about a matter of general public concern, is there? In my opinion, no. And I'm not talking about all the rest of the... I don't want to characterize it in any way, but the stuff that's flying around, and some of it's sticking to the wall, some of it's not. I'm just talking about that meeting and that discussion. Your Honor, I do not believe that what was expressed by HCI at that meeting were public concerns. Now, there may have been other concerns offered by other contractors, but the reference to HCI, who brought this lawsuit, is only about problems and logistical problems and differences of opinion between HCI and the city of Casper. And that's the way I interpret it. What's the operative First Amendment test here? I'm sorry? I mean, what is the operative First Amendment test here? You're talking about public concern. Are we under Garcetti? I mean, Garcetti deals with what a government employer, the constraints that they have or the liberties they have, actually, in controlling their workforce. I mean, is this a Garcetti-Pickering framework? Even though I know that was argued below and the court relied on it, but is that right? Is that what we're dealing with here? Your Honor, in our opinion, the better test is Worrell. And the reason I say that is because it's difficult to classify Mr. Hedquist when he was a candidate and after he won the primary election and before he took his seat as an employee. And I do note and I acknowledge that the district court used Garcetti-Pickering. We think the better test is Worrell just because it seems, as I understand it, Worrell applies to non-employee situations. So that seems like a better fit for this particular set of facts. I would comment that as for purposes of what we are discussing here today, sufficiency of evidence, the motivation for the speech, I think we end up in the same place no matter what test we take. One of the elements of Worrell deals with whether or not the speech was a substantial motivation. Yes, but I'm sorry, but let me, does it matter because you would have to define the universe of speech that could be cause for motivation, right? In other words, I mean, if you're saying that the speech doesn't have to be a public concern, Worrell, then you'd have a broader universe of speech that theoretically could be the basis for cause, right? That could cause retaliation. I believe I understand Your Honor's point. Worrell, though, the first factor is whether the plaintiff was engaged in constitutionally protected activity. Which is not the same as public concern. Those are two different things. You're nodding, so I assume you don't know. I'm processing. I mean, I did a little looking into this and it's not clear to me at all that they're entirely the same thing. The reason I'm nodding is that public speech or speech about a public concern would be a constitutionally protected activity. So I see that as fitting under the first Worrell problem. But couldn't the protected activity be broader than public concern is what I'm saying. The government cannot punish an individual for engaging, who is not an employee, for about their personal grievance, right? The government can't punish you for complaining about something that's a personal grievance. Would you agree with that? Yes, sir. OK, well, then that's not necessarily a public concern, is it? I think that the level of protection, the constitutional protection. Is narrowed as it relates to an employee. Yes, but that meeting of 2012 was about the general use of taxpayer money, and that is a matter of public concern, is it not? That would be a matter of public concern, Your Honor. But we do not believe that that email reflects that that was why I asked you about it and whether it's in the record, because the way it's being characterized in the briefs makes it sound as if that was the the general tenor of the meeting. And I appreciate that, Your Honor. And I I think that that takes me to a point that I need to make sure the court understands that the interpretations of the facts in this case and what they mean are could not be more diametrically opposed. And that's why I mean, obviously, we know the court is very diligent in reviewing the record, but I'd like to underscore how important it is here on summary judgment. Yes. Judge Johnson granted summary judgment. And I don't know that that helps. It sounds to me like you're saying there is a material dispute in the evidence. No, Your Honor. I think what we would call, with all due respect, the misinterpretation of facts does not create a genuine issue of material fact. The things that exist in this record that the district court found and we believe you will find do not match up with the with the characterization of those acts that the plaintiffs have given them. They need you to reach that conclusion in order for you to reverse summary judgment. I believe a reading of the record, a close reading of it, will show you that things like Ms. Bramlett mentioned, Rick Harrah was asked to provide cost information to Mr. Hedquist. What did it cost to do this particular process? That happened in February of 13. The request was made in March. Mr. Hedquist, and this is in the record as well, if my note is correct, it's volume 26, about page 5000. There was a public hearing where Mr. Harris spoke and this topic came up. And if you look at the transcript of that hearing, you will see that Mr. Harris said it took his staff. Mr. Mr. Hedquist asked for three years of cost information. It took Mr. Harris staff four weeks to gather it. He provided that information to Mr. Hedquist. And the problem that Ms. Bramlett refers to was not with a waste of money. It wasn't that money was was falling out of the city's pockets or wasn't accounted for. The problem that is explained in the letter that Ms. Bramlett referred to goes to the way the city was accounting for the spending of city funds, the way it was being accounted for, because they were using a blue book value instead of including fuel and maintenance costs. And they didn't include in the cost the cost of fringe benefits for those employees. So the question was, are these are these figures accurate or not? Sensitive to your time, please. Yes, sir. And with that, if there's no other questions, so I don't deprive Mr. Salzberg of his opportunity. Thank you. May it please the court. My name is Bruce Salzberg. I'm appearing today on behalf of John Patterson in his individual capacity. And I want to address the issue raised by the appellant with respect to the grant of summary judgment on qualified immunity grounds. I feel in some ways like I'm continuing the second argument that was made here. This morning, but let me let me do it anyway. When a defendant moves for summary judgment on qualified immunity grounds. The burden shifts to the plaintiff to make two showings, one that there has been a deprivation of a constitutional right and two that the law was clearly established at the time of the alleged deprivation. And the Supreme Court has made clear, mostly in recent cases, that the focus of the second prong of the qualified immunity analysis is on the conduct of the defendant. The question that the court needs to ask is whether the violative nature of particular conduct is clearly established, not whether the right is clearly established. That's a quote from Mullinex that you, Judge Holmes, cited to this morning, which is also a quote from Ashcroft versus Al Kitt. And at the plaintiff's muster, in your view, clearly established law as relates to Mr. Patterson, their suit against Mr. Patterson. Is there clearly established law that would govern their suit against Mr. Patterson, in your view? No, Your Honor, there is not. Clearly established law is the law, whether the law is clearly established is based upon Supreme Court cases, cases from this court or from the weight of authority from other jurisdictions. And why then Glover clearly established law for this case? Well, Glover is the one that's going to be discussed by Ms. Bestel, but it's not clearly established because it's an unpublished opinion. Yeah, I mean, there is a First Amendment. The claim against your client is a First Amendment retaliation claim, right? Yes, Your Honor. OK. So the retaliation that's alleged in this case is listed. There are about a dozen instances of retaliation listed at pages 41 through 43 of the plaintiff's brief. The question that the court needs to ask with respect to each of those items of retaliation or alleged retaliation is simply whether the plaintiffs at the district court cited the judge to law, which clearly established the violative nature of those items. Well, it's clearly established that cities and employers cannot retaliate against employees for a exercise of protected speech. Yes, Your Honor. The question is whether any of these items of alleged retaliation, one, is retaliation, and two, whether that law was clearly established in terms of... Well, as presiding judge, I've been looking at the clock a lot, wondering and worrying that everybody's going to have a chance to be heard. People are now referring to arguments that are going to be made by other counsel and the time has already expired for this counsel. So I want to extend a couple of minutes of extra time to you all collectively on the Apple East side. But please, if you'll stop the clock while I talk or else the time is running on against Betsy. Thank you. But I'm going to rely on you to patrol your time and patrol yourself so that your co-counsel can speak. Your Honor. It kind of reminds me back when I was back on the farm. If everybody upstream takes the water out of the irrigation ditch, there's not going to be any left for the people downstream. So don't forget you've got somebody downstream. If you're going to give us two minutes, Your Honor, I'm going to stand down. Thank you. My speech is over. No, I didn't mean to cut you off. Do you have any further that you wanted to say? I'll rely on my briefing. All right. May it please the Court. I'm Kay Lynn Bestel. I represent Andrew Beamer, the former city engineer, current director of public works in his individual capacity. So he's being sued in his individual capacity. He is, yes, by HCI. Okay. And a couple of points I'd like to make. One, in regard to Judge Lucero's question about the memorandum from the 2012 meeting with the contractors, that's in the record at 3158 through 3160. As far as who was there, Andrew Beamer was not. He did receive the memo. And the memo in that only refers to one comment being made by Craig Hedquist. And that comment had to do with how one of Mr. Hedquist's former contracts, actually ongoing contracts, was being handled. So all that Andrew, all that the record shows that Andrew knew about that contractor's meeting is what's in those pages I just cited you, which shows a very minimal commentary from Mr. Hedquist. He knew that not by being present, but by having had benefit of the memo after the fact. Correct. All of which occurred, which occurred two years before he, his department was involved in the recommendations on whether the contracts, the future contracts should be given to Mr. Hedquist. So it was two years prior to that, that he got that memo. The other comment that I wanted to talk about very briefly was Judge Holmes's question about Glover. Just two weeks ago, this court specifically held that Glover could not be used to in the Knope v. Williams case, came down just on March 5th. The other issues for why Glover is not controlling is because it was determined at a different stage in the proceedings. Glover was done on a motion to dismiss, not after two years of discovery. Glover was different because Glover involved a situation where the written recommendations in issue said we are doing this because of the speech. And in contrary, these recommendations refer only to non-speech events. The other primary difference from our perspective for Glover is that in this case, Andrew Beamer had direction from city council at the time he wrote the recommendations, or before he wrote the recommendations, that he was to write them and not give the, and not recommend the contract to the council.  I want to thank you, Your Honor. Please, a minute and a half to the appellant's time so that we can have equal treatment here. Thank you, Your Honor. Thank you. Thank you. Thank you for the time, Your Honor. A few comments on qualified immunity. As to Mr. Patterson, I think the court can find a clearer basis for qualified immunity from cases cited in our brief, but additionally, a block out of the Sixth Circuit, New York Times v. Sullivan out of the Supreme Court. And what does New York Times v. Sullivan have to do with this case? And when you're talking, I'm talking about factually opposite situation. I don't think it's factually opposite. I think it stands for a general proposition. Well, I think that the court can get there through Gentile Deloach, which is a Tenth Circuit case. And as far as a perfect case on point, we can look at Valesky-Levy, which is the Sixth Circuit case, looking at extraordinarily similar circumstances. It relied on another Sixth Circuit case called Friedel. And that case has been cited favorably by now Justice Gorsuch when he was the Tenth Circuit judge here with us in Colorado. And through Van Dielen, he cites to Deloach and those cases are all cited as far as Mr. Patterson's qualified immunity. As for Mr. Beamer's qualified immunity, the Mimics and the Deloach cases out of the Tenth, I think, are clearly established and combined with other... With respect to the meeting in 2012, the one that I think you characterized as a matter of general use of taxpayer money, that meeting, we're being told that there's nothing in the record about that meeting except a memorandum that does not, which I think implicitly the allegation is that that's not fairly characterized. I disagree with that characterization. First, there's two different memorializations in the record. There's an email from John Patterson, which is the one I think they're talking about, and there's a document in the record at 3162. He asked about participants. It's actually noted in a handwriting in a document produced by the city who was participating there in that meeting. But there's also an email from a city employee who was there, Mr. Myers, and that's, I believe, at 2135, Mr. Patterson's email also coming in at 3128. And that's an additional memorialization and it's a pages long email that mentions Headquist multiple times and talks about, and I guess I think pretty negatively characterizes the comments provided by all of the contractors at that meeting. Thank you very much for your argument. It was obviously, to me, and I'm sure to my colleagues as well, that this is a record study. And counsel are excused, the case is submitted, and the court should recess until tomorrow morning.